IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1401 EAST VIRGINIA AVENUE, DENVER, COLORADO,
57 LAKE RIDGE CIRCLE #1844, KEYSTONE, COLORADO,
$251,805.00 IN UNITED STATES CURRENCY,
$450,060.00 IN UNITED STATES CURRENCY,
$450,000.00 IN UNITED STATES CURRENCY,
$50,000.00 IN UNITED STATES CURRENCY,
ONE SILVER BAR AND 13 MISCELLANEOUS COINS,
$68,690.00 IN UNITED STATES CURRENCY,
$8,372.00 IN UNITED STATES CURRENCY,

       Defendants.

---

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

---

The United States of America, by and through United States Attorney John F. Walsh and Assistant United States Attorneys Tonya S. Andrews and Martha A. Paluch, pursuant to Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions G(2), states:

JURISDICTION AND VENUE

1.    The United States of America (the United States) has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. § 981(a)(1)(C), seeking forfeiture of the defendant property involved in violations of 18 U.S.C. § 1952.   This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.    Venue is proper under 19 U.S.C. § 1605 and 28 U.S.C. § 1395, as the defendant property is located, and most of the acts described herein occurred, in the District of Colorado.

<u>DEFENDANT PROPERTY</u>

3.      Defendant properties are more fully described, titled and encumbered as follows:

a.      1401 East Virginia Avenue, Denver, Colorado (hereinafter "defendant Virginia Avenue"), is more fully described as:   PLOT D BEING W 38 ½ FT OF E 300.00 FT OF S 100 FEET OF B10 LAKEVIEW, COUNTY OF DENVER, STATE OF COLORADO.   Upon information and belief, defendant Virginia Avenue is titled in the name of Daniel Dinner and Ginger L. Matarazzo.   According to the public records of Denver County, Colorado, defendant Virginia Avenue appears to be encumbered by a Mechanic's Lien in the amount of $1,036.73, for the benefit of Ferguson Enterprises, Inc., as Lien Claimant, which was recorded on September 30, 2010, at Reception Number 2010112054.

b.      57 Lake Ridge Circle #1844, Keystone, Colorado (hereinafter "defendant Keystone Condo"), is more fully described as:   CONDOMINIUM UNIT 1844, THE SEASONS AT KEYSTONE, ACCORDING TO THE CONDOMINIUM MAP THEREOF FILED JANUARY 17, 2003 AT RECEPTION NO. 708301 AND ACCORDING TO THE CONDOMINIUM DECLARATION RECORDED JANUARY 17, 2003 AT RECEPTION NO. 708298, COUNTY OF SUMMIT, STATE OF COLORADO.   Upon information and belief, defendant Keystone Condo is titled in the name of Daniel Dinner.   According to the public records of Denver County, Colorado, defendant Keystone Condo appears to be encumbered by a Deed of Trust in the principal amount of $215,000.00 for the benefit of Clarion Mortgage Capital, Inc. as Lender.

c.      $251,805.00 in United States Currency, seized on March 29, 2011, at 1401 East Virginia Avenue, Denver, Colorado ("defendant Virginia Avenue Currency").   Defendant

Virginia Avenue Currency is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

       d.     $450,060.00 in United States Currency, seized on March 29, 2011, from the residence of Daniel Dinner at 8082 West Chenango Place, Denver, Colorado ("defendant Chenango Place Currency").   Defendant Chenango Place Currency is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

       e.     $450,000.00 in United States Currency, seized on March 29, 2011, from a safety deposit box held in the name of Daniel Dinner, located at Guaranty Bank, 1331 17th Street, Denver, Colorado ("defendant Guaranty Bank Currency").   Defendant Guaranty Bank Currency is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

       f.     $50,000.00 in United States Currency, seized on March 29, 2011, from a safety deposit box held in the name of Ginger Dinner, located at FirstBank, 3500 South Wadsworth Boulevard, Denver, Colorado ("defendant FirstBank Currency").   Defendant FirstBank Currency is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

       g.     One Silver Bar and 13 Miscellaneous Coins, seized on March 29, 2011, from the residence of Michael Elick, at 10682 Black Horn Drive, Parker, Colorado ("defendant Bar and Coins").   Defendant Bar and Coins is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

       h.     $68,690.00 in United States Currency, seized on March 29, 2011, from the residence of Michael Elick at 10682 Black Horn Drive, Parker, Colorado ("defendant Black Horn

Drive Currency").   Defendant Black Horn Drive Currency is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

       i.    $8,372.00 in United States Currency, seized on March 29, 2011, from a black Ford Raptor inside the garage of 10682 Black Horn Drive, Parker, Colorado ("defendant Raptor Currency").   Defendant Raptor Currency is currently being held by the Internal Revenue Service, Criminal Investigation Division, in Denver, Colorado.

<u>FACTUAL BASIS FOR FORFEITURE</u>

4.    Except as otherwise noted, all of the following facts and information have been discovered through the observations and investigations of fellow law enforcement officers as reported to me.

5.    In late 2007 and continuing into late 2009, the Colorado Bureau of Investigation (CBI) conducted an investigation on a large-scale illegal gambling operation in the Denver, Colorado Metropolitan area.   During this investigation, a Confidential Informant (CI) provided statements to CBI Agent Ralph Gaglardi about other illegal gambling operations taking place in the Denver Metro area, including information about Daniel Dinner, who the CI claimed was operating as a bookie by taking sports bets around the Denver area.

6.    The CI stated he has known Dinner for many years and Dinner has been a bookie for the past 38 years.   The CI continued, stating Dinner only takes bets from people he knows, or from trusted sponsors within his betting group.   The CI stated he routinely conversed with Dinner and knew him to take bets in excess of $50,000.00 per week from various players.   The CI described Dinner as being the largest bookie in the Denver area by far.   The CI stated Dinner collects and pays out his earnings and winnings, in cash, either in person or by mail.   The CI has

-4-

known Dinner to receive large sums of money or mail large sums of money via DHL express mail service.

7.      The CI stated Dinner has many customers who belong to the Cherry Creek Country Club and he has personally seen Dinner hand out cash to people who have won money from him at this location.   The CI said Dinner has gone to this location with $40,000.00 to $60,000.00 in cash to make payouts from his illegal gambling operation.

8.      The CI stated Dinner operates an illegal on-line gambling operation where his customers have passwords to enter a website that is being operated "off-shore" and place bets.   He said the "office" or off-shore location does all the work for Dinner and he operates on a 50% sheet, meaning Dinner pays 50% percent of weekly winnings to the "office."   The CI believed Dinner to have a line of credit with this off-shore company in the amount of $500,000.00.   The CI knows Dinner to identify himself on the phone as #104, and stated each person, who is a customer of his and bets on-line, is assigned a specific number to identify themselves when calling.   Dinner assigns each customer a line of credit upon which they are allowed to bet against.   Dinner then checks the status of all customer accounts on-line on a daily or weekly basis and makes payouts and collections as appropriate.

9.      The CI stated Dinner sometimes has other people working for him who answer the phone and take or arrange bets.   The CI also said a bookie's busiest days with customers are Monday thru Wednesday.   Traditionally, a bookie will make collections and payouts on these days after weekend sporting events.

10.      On Wednesday, January 13, 2010, CBI Agents conducted a trash run at the residence of Dinner located at 8082 West Chenango Place, Denver, Colorado.   Agents located a

white envelope with hand written letters and numbers in blue ink: "Dan" and "from Mille and Russ."   Also written on the envelope was "571" in small numbers on the bottom right corner. Agents were able to partially piece back together a torn piece of white paper listing: "vs Iowa", "g +5", "-6 vs N", "-6 vs Sy", "Min", "take UAB", "take M", "vs North Ariz", "take Northern", -10 vs".   These notes would be consistent with notes of a bookmaker taking bets on college sports games.   On the back of this paper was an email header listing from: dandinner@comcast.net, believed to be the email address of Dinner.

11.    CBI Agents learned through surveillance efforts that Dinner consistently attended a weekly support group meeting.   On January 25, 2010, CBI Agent Ron Carscallen, acting in an undercover capacity, attended the meeting and learned that Dinner was one of the group's leaders. Dinner provided Agent Carscallen with a phone list for the group and he (Daniel) placed a star next to Dinner's name and phone number.

12.    After a February 25, 2010, meeting, Agent Carscallen and Dinner went to a Starbucks on East Hampden Boulevard so they could speak.   During their meeting, Dinner told Agent Carscallen that he has been a sports accountant, "bookmaker," for thirty-four (34) years and has recently, (since the "Final Four" last April, 2009) turned his bookmaking organization over to a friend that he has known for over seven (7) years.   Dinner stated he decided to become a bookmaker because he could make more money doing that than by just betting.   Dinner also stated he paid his clients on Mondays or Tuesdays and gave his clients a credit line.   Dinner stated he ran the business in a "grey area," but had not had any legal problems to date.   (Dinner knocked on wood at the table while making this statement.)   Dinner asked Agent Carscallen what the top amount he had ever bet, to which Agent Carscallen answered, "Approximately $7,000.00."

Dinner responded, saying, "You put in big plays."

13.     Following this meeting, CBI agents followed Dinner to another Starbucks located at the 1600 block of East Evans in Denver, Colorado.   CBI Agent Pearson went into the Starbucks and unbeknownst to Dinner, sat down near Dinner, who was met inside by an individual later identified as Stephen Martin.   Agent Pearson, seated approximately two feet from Dinner and Martin, could overhear the majority of the conversation between Dinner and Martin as the two of them began to play a game of cribbage together.

14.     During the cribbage game Dinner and Stephen Martin began talking about poker. Dinner told Stephen Martin about a poker tournament on Saturday, February 27, 2010.   Dinner stated that he was expecting 15-30 people to be playing in the tournament, and check in was at 9:00 a.m.   Dinner then began to tell Martin that he had recently sold his business as a bookmaker to someone named "Dale," who lives in Scottsdale, Arizona.   Dinner told Martin that he did not want to meet the cleaning lady of "Dale."   Martin asked to clarify what the "cleaning lady" was and Dinner advised that it was the person who collected debts for "Dale."   Dinner stated that the "cleaning lady" could be pretty nasty if he needed to be.

15.     Dinner offered to set up a new account for Stephen Martin with "Dale."   Dinner described the account to be internet based and that no credit card was needed.   Dinner said that all clients operate on a credit system and asked Martin how much he wanted for a line of credit. They agreed that Martin would receive a $6,000.00 line of credit on which to place bets.   Dinner stated it would be $1,000.00 payout per game.   Agent Carscallen heard Dinner call the bookie to set up Martin's account, and left a message vouching for Martin, stating that he was a teacher at Denver University.   Martin asked Dinner if the guy takes bets on international soccer, and Dinner

said that he did, as well as hockey, NCAA, and the Olympics currently.   Dinner said he took bets on many different sporting events.

16.     A few minutes later, Dinner received a call back and began talking about Stephen Martin and again vouching for him over the phone.   After a couple minutes, Dinner confirmed the credit limit to be $6,000.00, and repeated an account number as he wrote it down.   Dinner told the caller his password would be "BASEBALL19."   Dinner thanked the caller for calling and said he would put the two of them in touch soon.   Dinner disconnected from the call and told Martin it was all set and he would write down instructions for Martin.

17.     Dinner asked if Martin would be "OK" and mentioned that he knew Martin was a federal prosecutor at one time.   Martin stated he has been out of "DOJ" for the past ten years and Dinner has nothing to worry about.   Dinner reiterated he has never been in any trouble and didn't want to start now.

18.     On Friday, February 26, 2010, Agent Carscallen contacted Dinner and told him that he was disappointed that their conversation got interrupted during their previous meeting.   Dinner related he ran his bookmaking business with honesty and integrity and would run people down to pay them.   Dinner then stated that he would like to bring Agent Carscallen together with the individual he sold his bookmaking business to as long as Carscallen did not feel that there was any conflict between the support group they attended.   Dinner then stated that the bookmaking is internet based and that Michael Elick, the guy who Agent Carscallen would be dealing with directly, was local, and like a son to him.   Dinner explained that the internet site just keeps track of the bets and accounts, and that there is no credit cards, it is just cash between Elick and Agent Carscallen.   Dinner told Agent Carscallen he could call Elick and have him set up Agent

Carscallen's betting account.   Dinner then thanked Agent Carscallen for trusting Dinner in setting up the contact between Agent Carscallen and Elick, and added that this was the first time he had set up a contact between a member of the support group and Elick.

**Gambling Activity surrounding Michael Elick and Daniel Dinner**

19.     On Friday, February 26, 2010, Agent Carscallen called Michael Elick, who indicated that Dinner had told him to expect a call from Agent Carscallen.   Elick said that Dinner indicated Agent Carscallen "may be interested in playing a little sports."   Agent Carscallen related that Daniel Dinner had indicated that he would always pay out on Mondays or Tuesdays, and Elick confirmed he always "gets everyone paid on Mondays," and that he always pays everyone first before he collects.   Elick asked Agent Carscallen what kind of play he makes or what amount he bets.   Agent Carscallen and Elick then discussed what type of games Agent Carscallen wanted to bet on, and Elick indicated he would like to meet with Agent Carscallen in person.   Elick then said he would set Agent Carscallen up so he could play around on the website, and gave Carscallen the web address, www.Betjerrys.com.

20.     Elick then explained to Agent Carscallen how to access the website and place bets, informing him that when a $100.00 bet is placed, winnings would be $90.00 because of a ten percent (10%) take.   Elick told Agent Carscallen that the account was set up and asked about meeting face to face for coffee with Agent Carscallen on Monday, March 1, 2010.   Elick said he would set Agent Carscallen up with a $2,000.00 or $3,000.00 credit limit, and to call him if Agent Carscallen had any questions regarding the website.

21.     On February 26, 2010 and March 1, 2010, CBI traced the "www.betjerrys.com" website, with the NeoTrace program, and found that the server was traced to San Jose, Costa Rica

in Central America.

22.    Elick said he settles his accounts every week with his clients, but if Agent Carscallen only owes him a few hundred dollars, he (Elick) will collect at a later point, instead of going across town.   Elick said if he owes a client, he will always call to see if they want to collect their winnings.

23.    On Saturday, February 27, 2010, CBI Agent Carscallen went on-line to the Betjerrys.com website, and placed a $200.00 wager on the Bronze Medal Olympic Hockey Game in the 2010 Winter Olympics for FINLAND to beat SLOVAKIA.   The Line was "Finland -135," so Carscallen's $200.00 bet, if won, would pay out $148.15.

24.    On Monday, March 1, 2010, CBI Agent Carscallen was contacted by Michael Elick, who said that he noticed Agent Carscallen was up about $148.00 (meaning he had won his $200.00 wager from February 27, 2010, resulting in $148.00 in winnings).   Elick and Agent Carscallen agreed to meet on Wednesday, March 3, 2010.   Elick indicated that he didn't know if they were going to make a transaction for anything less than $200.00, but said that he would have the winnings packaged up for Agent Carscallen at their meeting.

25.    On March 3, 2010, Agent Carscallen met with Elick at a Starbucks located at 9998 West Colfax Avenue, Lakewood, Colorado.   During this meeting, Elick handed Agent Carscallen a white envelope containing $148.00 as payment for his gambling winnings.

26.    On Monday March 8, 2010, Agent Carscallen received a phone message from Elick stating, "ROB, MIKE.   Buddy how you doing, um, looks like we have a small figure, give me a call so we can schedule a time to meet up tomorrow."   This phone message was in reference to an on-line wager that Agent Carscallen had made and lost the previous week.   Later that day, Agent

Carscallen called Elick and they made arrangements to meet on March 11, 2010, to pay Agent Carscallen's gambling debt of $450.00.

27.     On March 11, 2010, at approximately 11:05 a.m., Agent Carscallen met with Elick at a Starbucks near West Remington Place in Littleton, Colorado.   Agent Carscallen handed Elick a Wells Fargo envelope containing $450.00 in official funds.   On the front of the envelope, Agent Carscallen had written "From Rob…450."   Agent Carscallen and Elick then had a brief conversation about the upcoming NCAA basketball tournament, before parting.

28.     On Friday, March 12, 2010, Agent Carscallen had a brief meeting with Dinner after the 12-step meeting, during which Dinner asked Carscallen how things were working out between him and Michael Elick.   Dinner also told Agent Carscallen that he (Daniel) had talked to his wife about setting Agent Carscallen up with Michael Elick in a sports betting relationship.   Dinner then stated his wife thought that it was okay and there was no problem with it since Agent Carscallen was attending the support group with Dinner.

29.     Shortly after this meeting, Dinner was observed meeting an individual, later identified as David Bloom, in a Starbucks Coffee in the 8000 block of East Orchard Road, in Greenwood Village, Colorado.   During this meeting, CBI agents observed Dinner hand a white envelope to David Bloom, who removed what appeared to be U.S. Currency from the envelope, and discard the envelope into a trashcan.   CBI agents recovered the discarded envelope from the trash and observed handwritten letters on the outside of the envelope as "David B."

30.     On Wednesday, March 17, 2010, Agent Carscallen called Michael Elick and asked about some problems he encountered with the casino feature on the www.betjerrys.com website. Elick stated that he tries to steer his clients away from the casino site but would check on

Carscallen's website account.   He also stated he would call "Costa Rica," to verify the parameters on the account.

31.     On Wednesday, March 31, 2010, Elick made arrangements to meet with Agent Carscallen at a Home Depot in Greenwood Village, Colorado.   During their meeting, Agent Carscallen handed Elick an envelope containing $255.00 in official funds for online bets he lost during the week of March 17, 2010.

32.     On Monday, May 3, 2010, Agent Carscallen received a phone call from Elick, who indicated that Agent Carscallen owed $490.00 for the previous week's losses, and that Elick's dad, Lonnie Elick, would call to make the arrangements.   Later that day, Agent Carscallen met with Lonnie Elick outside an Old Chicago Restaurant in Lakewood, Colorado.   During their meeting, Lonnie Elick received a phone call from Michael Elick.   Lonnie Elick was then followed from the meeting to a Bagel Deli near I-25 and Hampden Avenue, where officers observed Lonnie Elick hand a pack of white envelopes to Michael Elick.

33.     Between May 17, 2010, and October 25, 2010, Agent Carscallen met with Lonnie Elick, on behalf of Michael Elick, another nine times to either pay Agent Carscallen his winnings, or collect Agent Carscallen's losses on bets placed online by Carscallen.   During the same time frame, Agent Carscallen met directly with Michael Elick only once, on June 7, 2010.

34.     Telephone frequency reports that were obtained on Dinner's cell number show the www.betjerrys.com number of 800-858-6645 was called 246 times from the time period of 12/7/2009 to 7/28/2010.

35.     On Tuesday, January 11, 2011, CBI agents kept Michael Elick under surveillance, while Elick travelled to several Denver locations, carrying a black backpack, and met with

unknown individuals, one of which was seen taking a white envelope from Elick.   At approximately 12:00 p.m., Elick was followed to Rocky Mountain Coin Store in Greenwood Village, Colorado, where he stayed for approximately twenty minutes before returning home.

36.   On Wednesday, February 2, 2011, Agent Carscallen met with Lonnie Elick, who handed Agent Carscallen an envelope containing $1,250.00.   Lonnie Elick then stated that he would be handling all of Michael's business while Michael was on vacation, and that he normally handled some of the smaller bettors.   After being asked about Daniel Dinner, Lonnie Elick replied that Dinner has a new house at Washington Park (defendant Virginia Avenue), and that he believed Dinner was still getting a percentage of Michael's bookmaking business.

## 2011 Super Bowl Bet

37.   On Friday, February 4, 2011, Agent Carscallen left a phone message for Dinner asking if he had a phone number for Michael Elick.   Dinner called back and gave Agent Carscallen two phone numbers for Michael Elick.   Agent Carscallen asked Dinner if he (Dinnerl) was able to increase his (Agent Carscallen) bet limit for the Super Bowl.   Dinner replied that he did not have that ability but he would talk to Michael Elick about raising his bet limit and that Agent Carscallen had been a good client in the past and had always paid his debts in a timely manner.

38.   Later that day, undercover Agent Carscallen made contact with Michael Elick, who agreed to raise the bet limit that Agent Carscallen had from $500.00 to $2,500.00 per bet for the Super Bowl to be played the following Sunday, February 6, 2011.   Agent Carscallen hung up the phone with Michael Elick and then accessed the www.betjerrys.com website and placed a $2,500.00 bet on the Pittsburgh Steelers to win the Super Bowl.

-13-

39.     On Monday and Tuesday following the Super Bowl, Agent Carscallen received numerous voice mail messages from Michael Elick and Lonnie Elick asking that he call them back and meet to "clean this up," in reference to the Super Bowl bet for $2,500.00, which he had lost.

40.     On Wednesday February 9, 2011, Dinner called Agent Carscallen and left a voice message on the voice mail system asking that he (the agent) contact Michael Elick and "get this thing taken care of."

41.     Later that same day, Dinner left a message for Agent Carscallen stating that he (Dinner) had "vouched" for Carscallen and encouraged him to call Michael Elick and "take care of your biz with him."   Dinner also referred to the "opportunity on Sunday" referring to the increased bet limit from $500.00 to $2,500.00, in which $2,500.00 was bet on the Super Bowl.

42.     Also on Wednesday February 9, 2011, CBI agents conducted surveillance on Dinner at his new home, defendant Virginia Avenue.   At 2:14 p.m., Agent Carscallen observed a Blue Volvo station wagon pull up to the corner of the street in front of defendant Virginia Avenue, and saw Dinner walk out of the front door and to the Blue Volvo, then hand the driver what appeared to be a white envelope.   The driver of the Blue Volvo was identified as Jonathan Robert Douglas, also a known gambler.   This interaction is consistent with other gambling transactions that have been observed by CBI Agents when they have watched Dinner, Michael Elick and Lonnie Elick allegedly paying off clients for their bets.

43.     On Thursday, February 10, 2011, Dinner called Agent Carscallen and again left a voice mail message stating that he (Dinner) "vouched" for him and that Michael Elick owed him (Dinner) some money.   Dinner also said he would appreciate it if Agent Carscallen would pay Elick so he (Dinner) could get paid as well.

-14-

44.     On Thursday February 17, 2011, Agent Carscallen recorded a phone conversation with Dinner in which Dinner voluntarily stated that he (Dinner), "didn't mind taking a check on my part for what Michael owes me or if you want to send it to me and I can give it to Michael" referring to the money which the agent lost on his Super Bowl bet.

45.     On Sunday, February 20, 2011, Dinner left a voice mail message for undercover CBI Agent Carscallen stating "I thought we had an agreement that you were going to call Michael on Thursday or Friday and get that all handled."   Dinner also stated that he "had something come up really big on Tuesday afternoon or Wednesday morning at the latest that I have to comply with so I am really counting on you to finish that up, if you would kindly, and then I'll be ok and you'll be ok.  So call them and line that up for early this coming week, please."   Again, Dinner was referring to the money Agent Carscallen lost on his Super Bowl bet.

46.     On Tuesday February 22, 2011, Dinner again left a message for Agent Carscallen. This time Dinner was wondering if Agent Carscallen "had a chance to make an appointment to meet the guys" referring to meeting with Michael Elick to pay the bet from the Super Bowl.   Also on February 22, 2011, Agent Carscallen exchanged text messages with Dinner and arranged a meeting with him on Wednesday February 23, 2011, to discuss the payment of the bet from the Super Bowl.

47.     On Wednesday, February 23, 2011, Agent Carscallen waited for Dinner at the Starbucks located at 9998 West Colfax Avenue, Lakewood, Colorado.   A short time after arriving, Michael Elick arrived in place of Dinner.   Elick said he knew that Agent Carscallen was supposed to meet with Dinner, but he (Elick) was out this direction and was able to meet with him instead.   Agent Carscallen paid Elick $130.00 in official funds toward his losses for the Super

Bowl bet.

48.     On Monday, February 28, 2011, CBI Agents Zentner, Pearson and Harrelson traveled to Canon City, Colorado, to speak with the CI who originally informed the CBI about Dinner and his illegal gambling activity.   The CI told the agents about Dinner's gambling activities, and he also stated that when he was dealing with Dinner, Dinner was well known in the Denver area for buying casino chips from people who had returned from Las Vegas.   The CI said Dinner did this because he (Dinner) thought it was safer to carry $10,000.00 in poker chips than to carry $10,000.00 in cash. The CI said he thought Dinner kept these poker chips in a safety deposit box at a bank in Cherry Creek.

49.     From January 1, 2011, to March 29, 2011, Agent Carscallen has received a total of 48 phone messages, 23 from Dinner, 16 from Michael Elick and 9 from Lonnie Elick, all asking Agent Carscallen to contact them about his gambling activity.   There were also some text messages exchanged between Agent Carscallen and Dinner's or Michael Elick's cell phones.

## Assets Subject to Forfeiture

50.     On March 29, 2011, CBI investigators executed State Search Warrants on defendant Virginia Avenue, 8082 West Chenango Place in Denver, Colorado (Dinner's other residence), 10682 Black Horn Drive in Parker, Colorado (Michael Elick's residence), 730 Scranton Place in Aurora, Colorado (Lonnie Elick's residence), two safe deposit boxes associated with Dinner, and a couple of vehicles owned by Dinner and Michael Elick.

## Defendant Virginia Avenue

51.     In October 1996, Dinner bought a property located at 1401 E. Virginia Avenue, Denver, Colorado.   At that time, there was a small brick bungalow house located at that address.

-16-

Dinner purchased the property for $245,000.00 and took out two loans, one for $60,000.00, and one for $100,000.00. The loans were paid off in February 2009. Dinner had the brick house torn down and started the construction of a new house around October 2009. The construction was performed by Caribou Construction.

52.     Bank records show Dinner paid cashier checks to Caribou Construction starting in October 2009 and continuing through July 2010. There was a total of $129,421.62 in cashier checks going to Caribou from two of Dinner's bank accounts.

53.     On March 29, 2011, Search Warrants were executed on Dinner's residences, 1401 E. Virginia Avenue in Denver, Colorado (defendant Virginia Avenue), and 8082 West Chenango Place in Denver, Colorado. Records seized at these locations showed additional payments to Caribou Construction starting in October 2009 and continuing until August 2010. The total amount of the receipts was $609,972.47. The records from the search warrant also showed the cost of construction for defendant Virginia Avenue to be approximately $735,000.00.

54.     During the execution of the search warrants, Fred Cooke, the general contractor who did construction on defendant Virginia Avenue, stated that Dinner paid him a total of approximately $700,000.00 to build the house, which Dinner paid in cash.

55.     Loan records show Dinner obtained a line of credit (LOC) from Omni Financial on August 13, 2009 for $350,000.00 against defendant Virginia Avenue. After closing costs, Dinner took a check for $83,639.75 and had available a LOC for $250,000.00. This $250,000.00 loan was paid in full in November 2010.

**Defendant Keystone Condo**

56.     In September 2006, Dinner bought defendant Keystone Condo for $342,000.00. On October 1, 2006 Dinner took out a loan from GMAC for $215,000.00.   The loan was paid down to approximately $26,000.00 by December 2010.   The loan application shows Dinner made a $129,009.67 down payment in cash for the property.

57.     Bank records show in 2008, Dinner paid monthly mortgage payments totaling $25,723.13, which included an extra $500.00 principal payment per month during this time frame. In 2009, Dinner paid $59,225.84 in mortgage payments, which included four deposits on one day, totaling $30,000.00.   In 2010, Dinner paid a total of $21,115.26 in mortgage payments, which included an extra $250.00 principal payment per month during this time frame.

58.     As of December 1, 2010, Dinner has paid a total of $188,686.79 for defendant Keystone Condo since 2006, leaving approximately $26,000.00 as of December, 2010.

**Defendant Virginia Avenue Currency**

59.     During execution of the search warrant for defendant Virginia Avenue, officers seized $240,880.00 in bundled cash from a plastic container in the master bedroom, $10,525.00 from underneath the master bathroom cabinet, and $400.00 from the master bedroom dresser. These amounts total $251,805.00.

**Defendant Chenango Place Currency**

60.     During execution of the search warrant for Dinner's 8082 West Chenango Place residence, officers seized $450,060.00 in bundled cash from five plastic bags contained in a safe inside the hall closet.

### Defendant Guaranty Bank Currency

61.     During execution of the search warrant for Dinner's safe deposit box located at Guaranty Bank, 1331 17th Street in Denver, Colorado, officers seized $450,000.00 in bundled cash from inside various plastic bags and manila envelopes.

### Defendant FirstBank Currency

62.     During execution of the search warrant for Dinner's safe deposit box located at FirstBank, 3500 South Wadsworth Boulevard in Lakewood, Colorado, officers seized $50,000.00 in bundled cash from inside various plastic bags and manila envelopes.

### Defendant Silver Bar and Thirteen Miscellaneous Coins

63.     In addition to defendant Black Horn Drive Currency, officers seized a silver bar and thirteen miscellaneous silver coins from inside a bank bag in the upstairs closet safe in Elick's Black Horn Drive residence, along with a receipt for their purchase on January 11, 2011 (see paragraph 34, *supra*).

### Defendant Black Horn Drive Currency

64.     During execution of the search warrant for Michael Elick's 10682 Black Horn Drive residence, officers seized $2,500.00 in cash from several envelopes inside a banker bag, $1,820.00 in cash from a white envelope, and $64,370.00 in cash from various manila envelopes; all of these funds were further located inside a safe in an upstairs closet.

### Defendant Raptor Currency

65.     From Elick's black Ford Raptor in the garage of his Black Horn Drive residence, officers seized $1,675.00 in cash from an envelope marked "Bob Murphy;" $805.00 in cash from an envelope marked "Dean 809;" $1,840.00 in cash from an envelope marked "Bruce Madison

1843;" $3,842.00 in cash from an unmarked envelope; and $210.00 in cash from another unmarked envelope.

66.     A check of Colorado Department of Labor records indicates Daniel Dinner, Ginger Dinner, and Michael Elick have had no reported wages since 2004.   Additionally, surveillance from 2009 until present shows that neither Dinner nor Elick ever went to a job of any kind, or had any consistent employment other than their illegal gambling activities.

67.     Tax returns for Dinner that were seized during the execution of the search warrants show a minimal amount of reported income for Dinner, and his wife, Ginger Dinner.   The Form 1040 U.S. Individual Income Tax Return for Dinner for the year 2005 showed total income of $24,336.00.   The Form 1040 U.S. Individual Income Tax Return for Dinner for the year 2006 showed total income of $24,477.00.   The Colorado Individual Income Tax Return Form 1040 for Dinner for the year 2007 showed taxable income of $16,942.00.   The Form 1040 U.S. Individual Income Tax Return for Dinner for the year 2008 showed total income of $26,107.00.   The Form 1040X Amended U.S. Individual Income Tax Return for Dinner and Ginger Dinner for the year 2009 showed taxable income of $13,841.00.   The Form 1040 U.S. Individual Income Tax Return for Dinner and Ginger Dinner for the year 2010 showed total income of $31,200.00.

68.     During execution of the search warrants, all executed on March 29, 2011, a total of approximately $1.2 million in cash was seized from Dinner and Michael Elick's residences, safe deposit boxes, and vehicles.

69.     Based in part on the facts contained herein, Daniel Dinner and Michael Elick are currently subject to an ongoing criminal investigation.

## Conclusion

70.     Despite Daniel Dinner and Michael Elick having no, or only nominal legitimate income since at least 2004, they have amassed a significant amount of assets, including but not limited to, the defendant real properties and cash hoards named herein.   Investigation has shown that Dinner and Elick have been engaged in illegal gambling activities during this same time frame, and therefore, the defendant property represents proceeds of illegal gambling, defined as an "unlawful activity" and prohibited by 18 U.S. C. §1952.

71.     The facts set forth above are not all of the facts known to the investigation, but are sufficient to establish probable cause to believe that the defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

VERIFICATION OF TRISTA MERZ, SPECIAL AGENT
INTERNAL REVENUE SERVICE – CRIMINAL INVESTIGATION DIVISION

I, Special Agent Trista Merz, hereby state and aver that I have read the foregoing Factual Basis for Forfeiture and that the facts and information contained therein is true.

s/ *Trista Merz*
TRISTA MERZ, Special Agent
Internal Revenue Service – Criminal
Investigation Division


STATE OF COLORADO             )
CITY AND                      )ss.
COUNTY OF DENVER              )

The foregoing VERIFIED COMPLAINT FOR FORFEITURE *IN REM* was sworn to and subscribed before me this 9th day of May, 2011, by Trista G. Merz, Special Agent, Internal Revenue Service – Criminal Investigation Division.

s/ *Nicole C. Davidson*
My Commission Expires: 6/15/2014          Notary Public, State of Colorado

<u>FIRST CLAIM FOR RELIEF</u>

72.     The Plaintiff repeats and incorporates by reference each of the paragraphs above.

73.     By the foregoing and other acts, defendant Virginia Avenue is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

<u>SECOND CLAIM FOR RELIEF</u>

74.     The Plaintiff repeats and incorporates by reference each of the paragraphs above.

75.     By the foregoing and other acts, defendant Keystone Condo is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

<u>THIRD CLAIM FOR RELIEF</u>

76.     The Plaintiff repeats and incorporates by reference each of the paragraphs above.

77.     By the foregoing and other acts, defendant Virginia Avenue Currency is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

<u>FOURTH CLAIM FOR RELIEF</u>

78.     The Plaintiff repeats and incorporates by reference each of the paragraphs above.

79.     By the foregoing and other acts, defendant Chenango Place Currency is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

<u>FIFTH CLAIM FOR RELIEF</u>

80.     The Plaintiff repeats and incorporates by reference each of the paragraphs above.

81. By the foregoing and other acts, defendant Guaranty Bank Currency is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

SIXTH CLAIM FOR RELIEF

82. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

83. By the foregoing and other acts, defendant FirstBank Currency is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

SEVENTH CLAIM FOR RELIEF

84. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

85. By the foregoing and other acts, defendant Silver Bar and Coins is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

EIGHTH CLAIM FOR RELIEF

86. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

87. By the foregoing and other acts, defendant Black Horn Drive Currency is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

NINTH CLAIM FOR RELIEF

88. The Plaintiff repeats and incorporates by reference each of the paragraphs above.

89.     By the foregoing and other acts, defendant Raptor Currency is property which constitutes or is derived from proceeds traceable to violations of 18 U.S. C. §1952, and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States prays for entry of a final order of forfeiture for the defendant property in favor of the United States, that the United States be authorized to dispose of the forfeited property in accordance with law, and that the Court enter a finding of probable cause for the seizure of the defendant property and issue a Certificate of Reasonable Cause pursuant to 28 U.S. C. § 2465.

Respectfully submitted this 9th day of May, 2011.

JOHN F. WALSH
United States Attorney


By: s/ *Tonya S. Andrews*
    TONYA S. ANDREWS
    Assistant United States Attorney
    1225 17th Street, Suite 700
    Denver, Colorado 80202
    Telephone: (303) 454-0100
    FAX: (303) 454-0402
    E-mail: Tonya.Andrews@usdoj.gov
    Attorney for Plaintiff


By: s/ *Martha A. Paluch*
    MARTHA A. PALUCH
    Assistant United States Attorney
    1225 17th Street, Suite 700
    Denver, Colorado 80202
    Telephone: (303) 454-0100
    FAX: (303) 454-0402
    E-mail: Martha.Paluch@usdoj.gov
    Attorney for Plaintiff