# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No.   11-cv-01232-CMA-MEH

UNITED STATES OF AMERICA,

                Plaintiff,

v.

**1401 EAST  VIRGINIA AVENUE, DENVER, COLORADO**
**57 LAKE RIDGE CIRCLE #1844, KEYSTONE, COLORADO,**
**$251,805.00 IN UNITED STATES CURRENCY,**
**$450,060.00 IN UNITED STATED CURRENCY,**
**$450,000.00 IN UNITED STATES CURRENCY,**
**$50,000.00 IN UNITED STATES CURRENCY,**
**ONE SILVER BAR AND 13 MISCELLANEOUS COINS,**
**$68,690.00 IN UNITED STATES CURRENCY,**
**$8,372.00 IN UNITED STATES CURRENCY**

                Defendant.

_____

## CLAIMANT DANIEL DINNER'S MOTION TO SUPPRESS EVIDENCE
## AND TO DISMISS

_____

Claimant Daniel Dinner ("Dinner"), by counsel, William L. Taylor of Ridley, McGreevy & Winocur, P.C., pursuant to Rule G(8) of Supplemental Rules For Certain Admiralty And Maritime Claims To The Federal Rules Of Civil Procedure and the United States Constitution, hereby moves for an Order of this Court suppressing and excluding statements and evidence obtained in violation of Claimant Dinner's rights under the First, Fourth, and Fifth and Fourteenth Amendments to the United States Constitution, and in support asserts as follows:[1]

_____

[1] _/ The Government opposes this motion.

1

# INTRODUCTION

On or about March 29, 2011, the defendant's person, automobile, real property, and personal property were invaded by a combined governmental search and seizure. Subsequent searches and seizures were made at secondary sites, including other houses, banks, and offices of third parties.  These searches were executed by agents of the Colorado Bureau of Investigation ("CBI"), the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), and a variety of local police departments. The government seized the life savings of the defendant in the form of currency in an amount exceeding $1.2 million and two of his properties - - assets which the Government seeks forfeiture of in this action.  Upon information and belief, the combined state and federal investigation prior to execution of search and seizure warrants involved the installation of at least one Global Positioning System ("GPS") device without a search warrant by the FBI, and the surreptitious and warrantless infiltration of a therapeutic 12-Step Program for recovering addicts by an undercover agent of the CBI.

Mr. Dinner submits that the warrantless installation of the GPS device, and the warrantless infiltration of the private 12-Step Program constituted violations of Mr. Dinner's First, Fourth, Fifth  and Fourteenth Amendment rights, and that all fruits of these constitutional violations should be suppressed, and the case dismissed.

## FACTUAL BACKGROUND

The genesis of the Government's investigation in this case was an unrelated gambling investigation conducted by CBI and prosecuted by the Colorado Attorney General's Office.  The primary source of information for the Government about Mr. Dinner was a primary defendant in that earlier case, who was incarcerated in the Colorado Department of Corrections when interviewed by law enforcement agents.  The Government has identified him only as "Confidential Informant (CI) 927."

The Government undertook surveillance of Mr. Dinner in an apparent effort to corroborate what CI 927 told them – apparently with at least one warrantless GPS device – and by conventional means.  Agents tracked Mr. Dinner, an elderly Jewish male, to a gathering every day at about 6:00 a.m. at a protestant Christian church in southeast Denver.  They soon determined that the group Mr. Dinner was attending at the church was a 12-Step recovery program for sexual addicts or "sexaholics."  Without any basis for believing that Mr. Dinner was engaged in any impropriety – let alone illegality – within the private, confidential and *anonymous* setting of this therapeutic program, CBI decided to infiltrate the group by placing CBI Agent Ron Carscallen in the program undercover, posing as a recovering sexual addict.  No warrant or court approval was sought prior to the government's infiltration of this private group.

In order to preserve the essential feature of anonymity that fosters the confidential sharing of potentially embarrassing or even inculpatory information by participants (whence Sexaholics Anonymous and other 12-step programs, e.g. Alcoholics Anonymous, get their names), Twelve-Steppers are identified by first name

3

only, along with a last initial.  The imposter identified himself as "Rob" with no last initial. Ironically, it was Mr. Dinner that was assigned to orient "Rob" to the group.

It was clearly explained to "Rob" in orientation that,  (1) there was a guarantee of anonymity; (2) matters learned within the confessional of the 12-Step program were to remain within the program ("what's said here, stays here") with limited exception (specifically if a crime is acknowledged publicly in the group and it is a crime anticipated and not completed); (3) the basis of the therapy to be gained through the program is the guarantee of nondisclosure and the acceptance of a higher power; and (4) only if the guidelines explained can be respected and accepted can the applicant be introduced into the group.  There must be a sincere and announced purpose of rehabilitation of a curative nature in order for group acceptance to take place.

As is customary, at the very first meeting Agent Carscallen attended, the director of the meeting announced to the group that if anyone present was a law enforcement officer who might have an obligation to report what was learned in the group, that person's presence should be alerted by a raising of the hand so that all within the group could feel safe in the amount of sharing that they did in their rehabilitative efforts.  "Rob" did not identify himself as a police officer, or leave.

Based upon the deceptive assurances of the intruder, this make-believe 12-Stepper was welcomed into the confidential fold.  Through his acceptance into the group, he received not only the group orientation from Mr. Dinner, but also a list of the first names and last initials and telephone numbers of every member of the group.

4

Agent Carscallen used the confidential relationship forged with Mr. Dinner to insinuate himself into Mr. Dinner's confidence, and carried over the relationship from the 12-Step meetings to conversations outside the group setting – at coffee houses and restaurants.  During these conversations, it is alleged that Mr. Dinner made inculpatory revelations about past activity as a bookmaker, agreed to introduce Agent Carscallen to someone who could take his bets on sporting activities, and allegedly facilitated one such bet himself.  These later conversations led to development of the evidence recited in search warrants executed on and after March 29, 2011.

In short, the chain of evidence leading to the factual predicates for the search and seizure warrants in this case, and for the Government's Verified Complaint for Forfeiture *In Rem*, Doc. 1, began, upon information and belief, with the installation and use of at least one warrantless GPS device to track Mr. Dinner's movements – leading them to the 12-Step recovery program, continued with the warrantless infiltration of the private and confidential setting of that program, and culminated in execution of the warrants based on this chain of evidence illegally obtained.

<u>**FOURTH AMENDMENT VIOLATIONS**</u>

<u>**Infiltration of the 12-Step Program**</u>

The United States Constitution protects individuals from unreasonable searches and seizures. U.S.C.A. Const. Amend. IV.  Among other situations, a "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).  A person has a

5

reasonable expectation of privacy if the person has an actual expectation of privacy and society believes that this expectation is reasonable. *Katz v. United States,* 389 U.S. 347, 361 (1967).  The *Katz* test's first, subjective inquiry, is a question of fact.

Mr. Dinner and the other members of the 12-Step group each had an actual subjective expectation of privacy in their communications with fellow 12-Steppers. Communications at group sessions and between individual members are *expressly* confidential and not for publication outside the group.  At meetings, members are greeted by cards that read, "What you see here, what you hear here, when you leave here, let it stay here."[2]  The content of meetings is likewise *expressly* not for the ears of police - - officers are asked to identify themselves as such.  Meetings typically conclude with the following statement: "The things you heard were spoken in confidence and should be treated as confidential.  Keep them within the walls of this room and the confines of your mind."[3] Thus, members are instructed from the moment they enter a meeting until the minute they leave not to disclose what they have heard and expect that what they say will remain private.

Anonymity of the participants is perhaps *the quintessential* feature of 12-Step groups, without which such groups could not function.  In order to treat their addictions, a member of Alcoholics Anonymous or Sexaholics Anonymous must believe that he or she is free from recriminations and prosecution stemming from their private admissions. Admissions of wrongdoing are an essential element of the program:  Step Five of any

---

[2] __/ Thomas J. Reed, *Compulsory Disclosure of Confidential Communications Among Alcoholics Anonymous Members,* 70 ST. JOHN'S L. REV. 693, 741 (1996)
[3] __/ *Id.*

Twelve-Step program requires that participants have "Admitted to God, to ourselves and to another human being the exact nature of our wrongs."[4]  Members also understand that unless they reveal their innermost secrets and character defects, they have no hope of curing their addictive behavior and recovering from their illness.  Sex addicts in particular would certainly be very hesitant to reveal the often deeply embarrassing details of their addiction without an assurance of anonymity.

In *Katz* the Supreme Court found a Fourth Amendment violation when police attached an eavesdropping device to a public telephone booth.  *Katz,* at 351.  The Court's later cases applied the analysis of Justice Harlan's concurrence in that *Katz* that a violation occurs when government officers violate a person's "reasonable expectation of privacy."  Just as one can have a reasonable expectation of privacy in communicating with another on the telephone, protected from electronic eavesdropping of the government, as in *Katz*, one can have a reasonable expectation of privacy from governmental intrusions in communications in the group setting.  This is particularly true when the group setting expressly is designed to reveal sensitive, embarrassing revelations of fact in order to benefit from a therapeutic environment and to heal from the problems associated with addictive behavior.   It is even more true when law enforcement officer participants who might have a duty to report what they hear are asked to identify themselves so that communicants can speak freely, confident that those officers do not have conflicting loyalties – to the group or to their oaths of office.

---

[4] __/ www.12Step.org

The federal government itself has recognized the need for a court order with highly restrictive measures built in before allowing undercover agents to intrude into the extraordinarily sensitive setting of drug or alcohol abuse treatment programs . *See* 38 C.F.R. § 1.496, Orders authorizing the use of undercover agents and informants to criminally investigate employees or agents of [the Department of Veterans Affairs].  That regulation specifically proscribes the use of information obtained by an undercover agent or informant in criminally investigating or prosecuting any patient in such a program.  38 C.F.R. § 1.496(e).

Carscallen's targeting of Dinner inside the 12-Step program was a calculated act of deceit and manipulation.  And it was illegal.  Consent obtained by fraud is no consent at all, thus Carscallen was eavesdropping on the 12-Steppers' confidential communications, in violation of Colorado law.  *See* C.R.S. § 18-9-304.  Carscallen doubtless knew that a program of recovering sex addicts, during which they reveal their innermost secrets, provided the perfect opportunity to gain the confidence and trust of a devoted, regularly attending member like Dinner.  Carscallen understood the great benefit to him involved in developing such an intimate relationship with Dinner in that environment.  Indeed, in group therapy, the belief that others are fellow members of the group "makes possible frank and intimate conversation which would have been totally out of place when they were merely strangers."[5]

The second, objective inquiry is "tested against the customs, values, and common understandings that confer a sense of privacy upon many of our basic

---

[5] __/ James Rachels, *Why Privacy Is Important, in* PHILOSOPHICAL DIMENSIONS OF PRIVACY: AN ANTHOLOGY 290, 295 (Ferdinand David Schoeman ed. 1984).

activities." *Id.* at 446.  In determining objective reasonableness, the court must ask "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 182–83 (1984).  Thus, objective reasonableness is a fact-specific inquiry which takes into consideration all of the attendant circumstances.

Society in general, and at least one federal circuit expressly has recognized the importance of confidentiality to the success of a 12-Step program.  In *Cox v. Miller,* 296 F.3d 89 (2002), the Second Circuit was called upon to decide whether statements made in the context of an AA setting fell within the ambit of New York's priest-penitent privilege in a homicide case.  After concluding that New York's statutory privilege did not extend to the statements at issue there, because they were not made seeking spiritual guidance, the Circuit addressed the "[n]umerous self-help groups … [that] expressed outrage" at the defendant's conviction based on use of the statements made to fellow AA members.  *Id.,* at 421.  The Court quoted a representative sample of such outrage:

> "The confidentiality at AA is almost the same as the confessional.... Good Lord, if you don't have it at an AA meeting, then we are all threatened.... [O]nce you make [A.A.] people talk about one thing, what is to stop the authorities from deciding that they can come around for anything, an income tax case."

*Id.* (internal citations omitted).  In explaining the Court's limited role in making policy, as opposed to interpreting the law, the Court noted its and previous courts' recognition of the value of AA programs, and of the central importance of confidentiality to such programs' function:

> "[w]e have no reason whatever to doubt what we have been told: that A.A. is a vastly worthwhile endeavor; that it has saved the lives, health or well-being of

thousands of Americans, at least in part because it requires participants" to engage in intensive religious self-reflection. … We also have no reason to doubt the importance of confidentiality of communication to the success of the A.A. program."

*Id.* (citation omitted).   The Second Circuit thus cited societal affirmation of the confidentiality – i.e., an expectation of privacy -- applied to communications within the AA setting, and noted its acceptance that such confidentiality vital to the success of such programs.   Mr. Dinner does not here contend that use of any statements or evidence derived from the government's breach of the confidentiality and privacy of the SA setting violates any statutory evidentiary privilege.   He merely points to this line of authority for the proposition that society, including the Second Circuit, has recognized the legitimacy of the expectation of privacy of communicants in the 12-Step setting.

Evidence obtained as the result of an illegal search is the "fruit of the poisonous tree" and must be excluded. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Intangible as well as tangible fruits may be suppressed.  *Id.* at 485.  The appropriate question to ask in determining whether intangible evidence is an inadmissible tainted fruit is "whether, granting establishment of the primary illegality, the evidence…has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488.

CBI Agent Carscallen's invasion of the Twelve-Step program constituted an illegal search and Carscallen's relationship with Dinner – as well as the conversations and actions that arose from that relationship – intangible as they may be, was "come at by the exploitation of that illegality."  Carscallen's unlawful invasion of the program allowed him to exploit Dinner's trust when Dinner was in his weakest and most

10

vulnerable state – while admitting to himself and his confidantes his transgressions as a sex addict.  As a result of fraudulently obtaining Dinner's confidence, Carscallen was able to effect and perpetuate a close and continuing relationship with Dinner.  Any and all "fruits" of Agent Carscallen's illegal conduct are tainted and must be suppressed.

### Warrantless Installation/Use of GPS Device(s)

A search within the meaning of the Fourth Amendment also occurs when government officers install a GPS device on a person's vehicle and use that device to monitor the vehicle's movements.   *United States v. Jones*, ___ U.S. ___. Slip Op. at 3, No. 10-1259 (Jan. 23, 2012).

In this case, according to state prosecutors more than one GPS device was used to monitor the movements of Mr. Dinner's vehicle.  The CBI installed at least one device, ostensibly with a search warrant permitting its installation and use.  State prosecutors have also informed the undersigned that the FBI also installed a GPS device on Mr. Dinner's vehicle or vehicles.  The FBI's device(s) reportedly were installed and used to monitor Mr. Dinner's movements without a search warrant.  State prosecutors have been ordered to supply Mr. Dinner with all information about the FBI's actions in this connection by March 2, 2012.  Such an action by the FBI, without a warrant, was unreasonable and in violation of Mr. Dinner's Fourth Amendment rights.

All evidence obtained through the installation and use of such devices should be suppressed, as should all fruits derived therefrom. *Wong Sun*, 371 U.S. at 484.

## FOURTH AMENDMENT CLAIMS
## <u>AND FIRST AMENDMENT VIOLATIONS</u>

The Fourth Amendment of the United States Constitution establishes procedures or *process* that the government constitutionally must follow when it gathers information. *See, e.g., Katz.*  Though "protecting people, not places," *id. at* 350, the Fourth Amendment  often is vindicated by means of a focus on where evidence or documents are located, rather than what the evidence or documents reveal.  *See California v. Greenwood*, 486 U.S. 35, 39-–40 (1988) (upholding search and seizure of documents in garbage left out of for collection); *Robbins v. California*, 353 U.S. 420, 425–26 (1981) (holding searches of containers usually afforded Fourth Amendment protections were searchable without a warrant if the containers were in an automobile).

By contrast, the First Amendment is applied primarily by examining the *substantive* validity of laws, regulations, or government activities as applied to the content of the ostensibly protected activity.  *See Whitney v. California*, 274 U.S. 357, 373 (Brandeis, J. concurring) (stating the exercise of free speech and assembly are subject to restriction only if such restriction is essential to prevent some "substantive evil").

The Supreme Court has recognized the unique relationship between the First and Fourth Amendments in searches and seizures of expressive material, holding that, when First Amendment activities are implicated by a search or a seizure, Fourth amendment procedures must be followed with "scrupulous exactitude."  *Stanford v. Texas*, 379 U.S. 476, 485 (1965) ("[T]he constitutional requirement that warrants must

particularly describe the "things to be seized" is to be accorded the most scrupulous exactitude when the "things" are books and the basis for their seizure is the ideas which they contain. No less a standard could be faithful to First Amendment freedoms.").

When a search or seizure is conducted in the context of First Amendment expression, the procedure employed must be examined in light of the values of the freedom of expression. *See Roaden v. Kentucky*, 413 U.S. 496, 504 (1973) ("The setting of the bookstore or the commercial theater, each presumptively under the protection of the First Amendment, invokes such Fourth Amendment warrant requirements because we examine what is 'unreasonable' in the light of the values of freedom of expression."). *See also Tattered Cover, Inc. v. City of Thornton,* 44 P.3d 1044 (Colo. 2002) (holding government search warrant violative of Colorado Constitution).

In *Roaden*, a county sheriff purchased tickets to a drive-in theater and viewed a film. Id. at 498. The sheriff concluded the film was obscene and therefore its exhibition was in violation of a Kentucky state statue. *Id.* At the conclusion of the film the sheriff, without a warrant, arrested the manager of the theater and seized a copy of the film. *Id.* at 498–99. The Supreme Court held that the seizure by the sheriff was unreasonable under the Fourth and Fourteenth Amendment standards because the restraint involved expression protected by the First Amendment. *Id.* at 504.

Of signal importance in this case is the concept of anonymity. Entirely central to the core purpose of SA, the very presence of Agent Carscallen in the meetings violated Mr. Dinner's and all other members' First Amendment rights to freedom of association,

free expression, and free exercise of religion.[6]  As the *Tattered Cover* court explicitly recognized:

> "Anonymity is often essential to the successful and uninhibited exercise of First Amendment rights, precisely because of the chilling effects that can result from disclosure of identity. The Supreme Court has recognized this principle numerous times in various contexts."

*Tattered Cover*, at 1052 (footnote omitted).

The police procedures in this case did not meet the standard required by the First Amendment when infringing on expressive rights of the defendant or all other communicants at the 12-Step program.  In *Roaden*, the seizure was unreasonable "not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness."  *Roaden*, at 504.  Similarly, the searches and seizures worked in this case by means of the warrantless and surreptitious infiltration of a government agent into a setting and conversations subject to the First Amendment's protection of both expressive association and free exercise of religion was unreasonable not only because there were alternative methods that could have been used, but also because the restraint of the right of expressive assembly calls for a "higher hurdle in the evaluation of reasonableness" by the Court.

---

[6] __/ Federal courts have recognized the religious nature of AA for purposes of Establishment Clause analysis.  *See, .e.g., Cox v. Miller*, 296 F.3d at 107-110.

14

There was no relationship between the rights violated and the object of the investigation; indeed there was no reasonable suspicion that anything illegal was going on in connection with the 12-Step program at all.  In determining whether police actions here were reasonable under the Constitution, the Court must assess such reasonableness against the backdrop of the First Amendment protections that apply to this context.

## DUE PROCESS VIOLATIONS UNDER THE
## FIFTH AND FOURTEENTH AMENDMENTS

In surreptitiously infiltrating a confidential and constitutionally protected setting in order to illegally eavesdrop on private conversations, the government engaged in conduct that was so outrageous that it violated Mr. Dinner's rights to due process under the Fifth and Fourteenth Amendments of the U.S. Constitution.

The Fourth Amendment is not the sole measure of the constitutionality of the process by which the Government seizes and obtains forfeiture of property.  *U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 49-52 (1993).  The Fifth Amendment's guarantee of due process of law also limits the Government's power in the civil forfeiture context.  *Id.*

The due process doctrine of dismissal based upon the government's outrageous conduct is founded on the principle that fundamental fairness is offended when the conduct of law enforcement officers is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *U.S. v. Russell,* 411 U.S. 423, 431–32 (1973); *see also State v. Myers,* 689 P.2d 38

15

(1984); *State v. Smith,* 610 P.2d 869, *cert. denied,* 449 U.S. 873 (1980). For police conduct to violate due process, the conduct must shock the universal sense of fairness. *Russell,* at 432.  Although the undersigned has located no case applying this doctrine to federal civil forfeiture proceedings, given the Supreme Court's application of other due process concepts of the Fifth Amendment to civil forfeiture, s*ee U.S. v. James Daniel Good Real Property*, it would appear applicable.

Whether the government has engaged in outrageous conduct is a matter of law, not a question for the jury. *United States v. Dudden,* 65 F.3d 1461, 1466–67 (9th Cir.1995). Following *Russell,* nearly every federal circuit court and many state courts have recognized that the government's conduct may be so inappropriate as to violate due process. *See United States v. Harris,* 997 F.2d 812, 815 (10th Cir.1993); *Commonwealth v. Nelson,* 666 A.2d 714, 719 (1995); *State v. Shannon,* 892 S.W.2d 761, 765 (Mo.App.1995).

Courts are split on whether a separate constitutional violation must have been committed by the government to make out a cognizable due process claim.  *Compare, e.g., Myers,* 689 P.2d 38 (separate constitutional violation required) *with United States v. Smith,* 924 F.2d 889, 897 (9th Cir.1991)( recognizing right of defendant to claim a due process violation based on outrageous government conduct without requiring a separate constitutional violation).

Here, the government's conduct did violate specific constitutional rights of the Defendant – under the First and Fourth Amendments to the U.S. Constitution.  Even courts opposed generally to the doctrine of outrageous governmental conduct have

recognized the propriety of proscribing police conduct that violates the rights of a defendant: "Where police conduct violates explicit rights, such as the Fourth Amendment protection against unwarranted searches and seizures, it is highly appropriate for the judiciary to proscribe the behavior."   *State v. Rundquist,* 905 P.2d 922 (1995).

Although, such claims largely have occurred in the context of entrapment – essentially "constitutional entrapment" cases, the doctrine is broader than that context. For example, summarizing holdings from the federal courts, the court in *Myers* observed: "It appears that the broad "fundamental fairness" guaranty is not transgressed absent "coercion, violence or brutality to the person". *See Irvine v. California,* 347 U.S. 128, 132, 133(1954) (distinguishing *Rochin v. California,* 342 U.S. 165 (1952)). *See also U.S. v. Kelly,* 707 F.2d 1460 (D.C.Cir.1983), and cases cited therein. But the doctrine has been recognized to be broader than the entrapment or physical brutality context: *See United States v. Bogart,* 783 F.2d 1428, 1435 (9th Cir.1986), *vacated on other grounds with respect to one defendant sub nom. U.S. v. Wingender,* 790 F.2d 802 (9th Cir.1986).

In reviewing a claim by a criminal defendant that Due Process has been violated by a particular state procedure, the Court is to determine whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson v. New York,* 432 U.S. 197 (1977). The court should evaluate the conduct based on the "totality of the circumstances." *United States*

*v. Tobias,* 662 F.2d 381, 387 (1981), *cert. denied,* 457 U.S. 1108 (1982); *State v. Hohensee,* 650 S.W.2d 268 (Mo.App.1982).

A number of facts are relevant to an analysis of the propriety of law enforcement's conduct here under the totality of the circumstances.   First, the government had no justification for invading the protected setting of a recognized 12-Step treatment program.   There was no reasonable suspicion that Mr. Dinner or anyone else was using the program to commit or facilitate any crimes. The police simply saw an opportunity to get their agent close to Mr. Dinner, either regardless of the sensitivity of the setting, or precisely because of it.   Second, CBI's conduct amounted to criminal activity itself, in violation of a state eavesdropping statute.   Third, the government conduct here demonstrates a greater interest in creating crimes to prosecute than in protecting the public from further criminal behavior. Although the CBI imposter quickly learned that Mr. Dinner was not engaged in bookmaking activity, it continued the ruse and the constitutional invasion of the 12-Step program.   Fourth, law enforcement had a large number of untried and far less invasive investigative tools at its disposal.

In this case, the government's conduct was so outrageous that it shocks the universal sense of justice.   12-Step programs have become a nationally recognized treatment alternative for millions of people attempting to recover from addictions of varying kinds.   Physicians, mental health professionals, and social workers refer their patients and clients to such programs as sources of additional treatment and continuing care.   Courts in most, if not all, jurisdictions rely on such programs to augment the rehabilitative resources available to the criminal justice system.   These programs simply

18

cannot function if the government may, without judicial supervision, without demonstrated need or cause, invade them in pursuit of their quarry in criminal investigations.   Such a practice, if sanctioned by the courts generally, or by this honorable Court in this case, would not only destroy the confidential, private and anonymous environment essential to such organizations' operation, preventing those needing this vital function from availing themselves of it, but would chill the exercise of constitutional rights by their members.

While the exclusionary rule exists to deprive the government of illegally-gotten gains in violation of the Fourth Amendment, it is not clear that such a remedy is available for the pure First Amendment violations inherent here, as a result of the government's conduct.   Without an exclusionary remedy, the appropriate remedy is dismissal – because otherwise the violations of Mr. Dinner's and others' First Amendment rights will go unremedied, and because for the Court to permit the Government to maintain this forfeiture action based upon an investigation so blatantly in violation of constitutional rights would be unconscionable and would itself work a violation of Mr. Dinner's right to substantive due process under the Fifth Amendment to the United States Constitution.

**WHEREFORE**, Claimant Daniel Dinner respectfully requests that this Court enter an order suppressing all statements and evidence derived from the constitutional violations described herein, and dismissing the case for outrageous governmental conduct.

Dated:  February 13, 2012

Respectfully submitted,

_/s/ William L. Taylor_
William L. Taylor, #21098
Ridley, McGreevy & Winocur P.C.
303 16th Street, Suite 200
Denver, CO  80202
Telephone:  (303) 629-9700
Fax:  (303) 629-9702
E-Mail:  wltaylorpc@gmail.com;
taylor@ridleylaw.com
_Attorney for Claimant Daniel Dinner_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 13, 2012, I served a true and correct copy of the foregoing **CLAIMANT DANIEL DINNER'S MOTION TO SUPPRESS EVIDENCE AND TO DISMISS** via CM/ECF filing addressed to the following:

**Tonya Shotwell Andrews**
U.S. Attorney's Office-Denver
1225 17th Street East
#700
Denver, CO 80202
303-454-0100
303-454-0402 (fax)
Tonya.Andrews@usdoj.gov
  *Attorney for Plaintiff*

**Martha Ann Paluch**
U.S. Attorney's Office-Denver
1225 17th Street East
Seventeenth Street Plaza
#700
Denver, CO 80202
303-454-0100
303-454-0402 (fax)
Martha.Paluch@usdoj.gov
  *Representing Plaintiff*

**Mitchell Baker**
Mitch Baker, Attorney at Law
1543 Champa Street
#400
Denver, CO 80202
303-592-7353
303-571-1001 (fax)
mitchbaker@estreet.com
  *Attorney for Claimant Ginger Dinner*

**Karl J. Geil**
Karl J. Geil, P.C.
621 17th Street
Suite 2655
Denver, CO 80293
303-295-6261
303-298-0716 (fax)
karl_geil@prodigy.net
  *Representing Claimant Shelly Lynn Elick*

*s/ William L. Taylor*