| | |
|---|---|
| DISTRICT COURT, JEFFERSON COUNTY, STATE OF COLORADO<br><br>Court Address: 100 Jefferson County Parkway<br>Golden, CO 80401<br>(303) 271-6215 | |
| **The People of the State of Colorado,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**DANIEL DINNER,**<br><br>**Defendant.** | |
| <u>Attorneys for Defendant:</u><br>Leonard M. Chesler, Reg. No. 3631<br>Law Firm of Leonard M. Chesler, P.C.<br>1343 Delaware Street<br>Denver, Colorado 80204<br>Telephone: (303) 893-8933<br>Facsimile: (303) 893-3847<br>Email: cheslerlawfirm@yahoo.com<br><br>William L. Taylor, Reg. No. 21098<br>Ridley, McGreevy & Winocur, P.C.<br>303 16th Street, Suite 200<br>Denver, CO 80202<br>Telephone: (303) 629-9700<br>Facsimile: (303) 629-9702<br>Email: taylor@ridleylaw.com | Case No. 11CR1744<br><br>Courtroom 5C |

### MOTION TO DISMISS AND/OR FOR SUCH LESSER BUT APPROPRIATE RELIEF AS SUPPRESSION OF STATEMENTS AND EVIDENCE

COMES NOW the defendant by counsel, Leonard M. Chesler of the Law Firm of Leonard M. Chesler, P.C., and William L. Taylor of Ridley, McGreevy & Winocur, P.C., and respectfully moves this honorable court for an order dismissing the Indictment in its entirety, or alternatively for suppression of statements made and evidence observed and later seized from this defendant and other relevant sources as fruits of violations of the defendant's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution as well as related and associated constitutional rights under the Colorado Constitution. As grounds for this request, the defendant states as follows:

1

Attachment A

## INTRODUCTION

1.      This is an action wherein your defendant, Daniel Dinner, a 60-year-old Caucasian male, who is a lifelong resident of the state of Colorado with no criminal history whatsoever, save and except for an occasional and minor traffic violation, has been charged with a violation of the Colorado Organized Crime Control Act ("COCCA"), one of the most serious crimes of statutory record, based on misdemeanor predicates alone.  The entire government investigation, apart from the initial step of debriefing a convicted felon at the state penitentiary, flows from the deliberate, warrantless and illegal undercover infiltration of the private, confidential, therapeutic and religious setting of an anonymous 12-Step sexual addiction recovery group by agents of the Colorado Bureau of Investigation.  This shocking conduct by state police was as needless as it was illegal.  All of the investigation downstream of the resultant violations of Mr. Dinners' (not to mention other 12-Step group members') constitutional rights fatally infect evidence subsequently derived.  Both to prevent the government from enjoying the use of fruits of this series of illegal searches and seizures and to vindicate Mr. Dinner's substantive rights under the First Amendment and Due Process clauses of the Fifth and Fourteenth Amendments so outrageously violated, the Court should suppress the government's evidence and dismiss this case.

## FACTUAL BACKGROUND

2.      On or about March 29, 2011, the defendant's person, automobile, real property, and personal property were invaded by a combined governmental search.  That search was directed under the guidance of the Jefferson County District Attorney's Office with apparent involvement of the Colorado Bureau of Investigation, the Colorado Attorney General's Office, the Federal Bureau of Investigation, the Internal Revenue Service, and a variety of local police departments.  The government seized the life savings of the defendant in the form of currency in an amount greater than One Million Dollars ($1,000,000.00).  The defendant and the money seized, along with defendants' real property, also have become the subject of a federal forfeiture action and a federal tax evasion investigation.

3.      There is a clear million-dollar motive to the investigation, the seizure, and the subsequent distribution of assets seized and sought to be forfeited.  This is not purely a criminal investigation without a government side motive.

4.      The genesis of the investigation was an incarcerated convicted felon sentenced out of Jefferson County in the First Judicial District of the state of Colorado.  This convict, whom the government has dubbed "Confidential Informant ("CI") 927," was prosecuted jointly by the Jefferson County District

2

Attorney's Office and the state Attorney General's criminal division. Although the government has not yet disclosed, and it is not yet clear whether cooperation was solicited from CI 927 by the government or CI 927 sought concessions from the prosecutors, the government put itself in the position of relying upon someone whose credibility may have previously been impugned by the government itself as an unreliable criminal, whom they themselves urged at sentencing be caged in order to protect society from his aggressive and illegal tendencies.

5.     Based upon information from this convict an investigation began, shepherded by the Jefferson County District Attorney's Office. According to matter given to the indicting Grand Jury, the CBI decided to apply unusual investigative techniques in this matter.

6.     Surveillance of Mr. Dinner left the CBI unable to corroborate any of CI 927's allegations of criminal conduct against him – as opposed to non-criminal conduct. Although the agents did not observe Mr. Dinner engaging in any illegal conduct, they did track his movements. CBI agents were able to determine, for example, that Mr. Dinner, an elderly Jewish male, apparently was attending a gathering every morning without fail, not just on the Sabbath or on Sunday mornings, and not at a synagogue, but each and every day at about 6:00 a.m. at a protestant Christian church located in southeast Denver. Agents determined that the gathering Mr. Dinner was attending each morning was a 12-step program for recovering sexual addicts. Without any basis whatsoever for believing that Mr. Dinner was engaged in any impropriety – let alone illegality – within the sensitive, private, confidential and *anonymous* setting of this therapeutic and spiritual 12-step program, CBI decided to infiltrate the 12-step group by placing CBI Agent Ron Carscallen in the program under cover, posing as a recovering sexual addict.

7.     The Grand Jury apparently was not advised, and thus discovery has not yet revealed, whether this was the creative action of CBI Agent Ron Carscallen as a "wild card" or whether his actions were designed and directed with the guidance and assistance of a prosecutor's office. The defense has sought information concerning the agency by which this ploy came to be, but its requests have been denied.

8.     What is documented is that Agent Carscallen, pretending to be an addict named "Rob," invaded this 12-Step program known as Sexaholics Anonymous ("SA"). It is also clear that the invasion of this private setting and the surreptitious eavesdropping on confidential conversations of the participants in the 12-step program thereby effected were perpetrated by Agent Carscallen and his CBI confederates without benefit of search or seizure warrant or prior court order. Rather, discovery reveals that the searches and seizures of confidential settings, conversations, and information by Agent Carscallen and the CBI were

warrantless and conducted outside of any exception to the Warrants Clause of the Fourth Amendment or its counterpart in the Colorado Constitution.

9.      Ironically, the one member of this protected group, in a program designed for religious guidance and therapeutic enrichment, assigned by the group to do the orientation for Agent Carscallen was Daniel Dinner.  In order to preserve the essential feature of anonymity that fosters the confidential sharing of potentially embarrassing or even inculpatory information by participants (and from whence SA and other 12-step programs, e.g. AA and NA get their names), Twelve-Steppers are identified by first name only along with a last initial.  The imposter identified himself as "Rob" with no last initial.  It was clearly explained to him in orientation that:

        (A)     There was a guarantee of anonymity;

        (B)     Those matters learned within the confessional of the 12-Step program were to remain within the program ("what's said here, stays here") with limited exception, specifically if a crime is acknowledged publicly and in the group and that it is a crime anticipated and not completed; .

        (C)     The basis of the therapy to be gained through the program is the guarantee of nondisclosure and the acceptance of a higher power; and

        (D)     Only if the guidelines explained can be respected and accepted can the applicant be introduced into the group.  There must be a sincere and announced purpose of rehabilitation of a curative nature in order for group acceptance to take place.

10.     People attending 12-Step programs are not casually there.  Many have been referred to a program by their doctor or by their therapist.  Many who cannot afford regular therapy by a psychiatrist or psychologist because of cost, but who are dedicated to solving an ailment of addiction, receive group assistance, often daily at a place of guaranteed anonymity.  Based upon the deceptive assurances of the intruder, this make-believe 12- Stepper was welcomed into the confidential fold.  Through his acceptance into the group, he received not only the group orientation from Mr. Dinner, but also a list of the first names and last initials and telephone numbers of every member of the group.  This phone list was critical to the conduct of the future investigation.

11.     At the very first meeting Agent Carscallen attended, the director of the meeting announced to the group that if anyone present was a law enforcement officer who might have an obligation to report what was learned in the group, that person's presence should be alerted by a raising of the hand so that responses within the group and loyalties flowing from the group of persons with common addictions could feel safe in the amount of sharing that they did in

their rehabilitative efforts. "Rob" sat motionless; no hand was raised; the deception continued.

12.    It was at this point, early in the investigation and presumably under guidance of the prosecution that the freedom of speech, freedom of association, free exercise of religion, guarantee of anonymity, and the social policy of acceptance of the therapeutic benefits of 12-Step guidance, and the defendant's legitimate expectation of privacy was breached.

13.    There were other available investigatory avenues that did not involve the invasion of this setting or the violation of the constitutional rights that protected it and its participants. Surveillance could and did continue. Some judges might sign wiretap or eavesdropping orders, even if they are based upon a caged felon's information that has not otherwise been corroborated. Interviews of reported associates could have taken place. Grand jury subpoenas for records from banks, financial institutions, real estate records, automobile dealer records, were all possible to obtain without disguise, deception, and constitutional infringement.

14.    The CBI's deceptive infiltration of the 12-step program worked as intended. "Rob" was able to convert the confidential relationship with Mr. Dinner within the confines of the group into a coffee house relationship in which Mr. Dinner reposed confidence in him. Among the vital information elicited from Dinner by Carscallen as he carried the relationship from the church to the coffee house was (1) that Dinner was no longer in the business of taking bets or engaged in any illegal activity, (2) that he no longer accepted wagers, (3) that he had divorced himself from that activity, and (4) that although at "Rob's" request, he could introduce or refer him to the person who had received his interest in that business, he was reluctant to do so unless Carscallen promised him that gambling was not among his (Carscallen's) addictions. It is this referral that we anticipate will be the connection between Dinner and an alleged enterprise from which he had already severed himself and which would not have been known and which had not been learned by the government until they invaded the privacy insured by the 12-Step network.

15.    It was not accidental; indeed it was intentional, that at this early stage of the investigation, disguise was directed rather than court involvement and traditional means of investigation. The invasion of this private and confidential therapeutic setting by an undercover police agent was accomplished for the sole purpose of trading on the relationship as mutual confidantes that Agent Carscallen calculated and contrived to create with Dan Dinner. There was no legitimate suspicion that he was recruiting bettors from among the group. Invasion of this constitutionally protected setting on the uncorroborated word of CI 927 likely would have, and should have been denied by a neutral magistrate reviewing an *accurate and complete* account of the investigative record at that

5

time.  Accordingly all subsequent evidence collected flows directly from the constitutional violations perpetrated within the 12-step program.

## FOURTH AMENDMENT VIOLATIONS

16.　　Agent Carscallen's warrantless infiltration of the SA 12-Step program constituted an unlawful invasion of privacy and warrantless search and seizure under the United States and Colorado Constitutions.

17.　　Both the United States and the Colorado Constitution protect individuals from unreasonable searches and seizures. U.S.C.A. Const. Amend. IV; C.R.S.A. Const. Art. 2, § 7. A "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen, 466 U.S. 109, 113 (1984)*. A person has a reasonable expectation of privacy if the person has an actual expectation of privacy and society believes that this expectation is reasonable. *Katz v. United States,* 389 U.S. 347, 361 (1967).

18.　　The test formulated in *Katz* is also followed by Colorado courts. See *People v. Lesslie,* 939 P.2d 443, 440 (Colo.App. 1996) ("The inquiry as to the existence of a reasonable expectation of privacy asks whether a person has exhibited an actual expectation of privacy and whether society is prepared to recognize that expectation as legitimate.")  The test's first, subjective inquiry is a question of fact.

19.　　It is clear here that Mr. Dinner and the other members of the 12-Step group each had an actual subjective expectation of privacy in their communications with fellow 12-Steppers.  Communications at group sessions and between individual members are *expressly* confidential and not for publication outside the group.  At meetings, members are greeted by cards that read, "What you see here, what you hear here, when you leave here, let it stay here."[1]  The content of meetings is likewise *expressly* not for the ears of police - - officers are asked to identify themselves as such.  Meetings typically conclude with the following statement: "The things you heard were spoken in confidence and should be treated as confidential.  Keep them within the walls of this room and the confines of your mind."[2]  Thus, members are instructed from the moment

---

[1] Thomas J. Reed, *Compulsory Disclosure of Confidential Communications Among Alcoholics Anonymous Members,* 70 ST. JOHN'S L. REV. 693, 741 (1996)

[2] *Id.*

they enter a meeting until the minute they leave not to disclose what they have heard and expect that what they say will remain private.

20.     Indeed, anonymity of the participants is perhaps *the quintessential* feature of 12-Step groups, without which such groups could not function. In order to treat their addictions, a member of Alcoholics Anonymous or Sexaholics Anonymous must believe that they are free from recriminations and prosecution stemming from their private admissions.   Admissions of wrongdoing are an essential element of the program:  Step Five of any Twelve-Step program requires that participants have "Admitted to God, to ourselves and to another human being the exact nature of our wrongs."[3]  Members also understand that unless they reveal their innermost secrets and character defects, they have no hope of curing their addictive behavior and recovering from their illness.

20.     The second, objective inquiry is "tested against the customs, values, and common understandings that confer a sense of privacy upon many of our basic activities." *Id.* at 446.  In determining objective reasonableness, the court must ask "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." <u>*Oliver v. United States,*</u> <u>466 U.S. 170, 182–83 (1984)</u>.  Thus, objective reasonableness is a fact-specific inquiry which takes into consideration all of the attendant circumstances. <u>*People*</u> <u>*v. Oynes,* 920 P.2d 880, 882 (Colo.App.1996)</u>.

21.     Communications made during the 12-Step program should be afforded protection under both the United States and Colorado Constitutions because members enjoy an actual expectation of privacy that society recognizes as reasonable.  Society recognizes members' expectation of privacy as legitimate.  While programs may be open to the public, it is well understood that attendance at programs is solely intended to facilitate one's own treatment and aid in the recovery of other members of the group.  Attendance at programs for ulterior purposes compromises the recovery process and jeopardizes the success of the program.

22.     Society also recognizes that anonymity is essential to treatment because successful recovery depends upon members' willingness to divulge their deepest and darkest secrets.  Therefore, Twelve-Step programs emphasize the essential importance of anonymity in the recovery process.  Given the deeply personal nature of the conversations at programs, members would no doubt be extremely reluctant to participate absent an expectation of privacy in their communications.  Sex addicts in particular would certainly be very hesitant to

---

[3]www.12Step.org

7

reveal the often deeply embarrassing details of their addiction without an assurance of anonymity.

23.      Any and all "fruits" of Agent Carscallen's illegal conduct are tainted and must be suppressed.  Evidence obtained as the result of an illegal search is the "fruit of the poisonous tree" and must be excluded. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  Intangible as well as tangible fruits may be suppressed. *Id.* at 485.  The appropriate question to ask in determining whether intangible evidence is an inadmissible tainted fruit is "whether, granting establishment of the primary illegality, the evidence…has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488.

24.      CBI Agent Carscallen's invasion of the Twelve-Step program constituted an illegal search and Carscallen's relationship with Dinner – as well as the conversations and actions that arose from that relationship – intangible as it may be, was "come at by the exploitation of that illegality."  Carscallen's unlawful invasion of the program allowed him to exploit Dinner's trust when Dinner was in his weakest and most vulnerable state – while admitting to himself and his confidantes his transgressions as a sex addict.  As a result of fraudulently obtaining Dinner's confidence, Carscallen was able to effect and perpetuate a close and continuing relationship with Dinner.

25.      Carscallen's constitutional violations were unnecessary.  CBI conducted extensive surveillance of Dinner prior to Carscallen's infiltration of the 12-Step program.  This surveillance revealed that Dinner regularly exercised at a neighborhood gym, frequented a local coffeehouse, and otherwise adhered to a predictable daily routine.  Accordingly, Carscallen could have attempted to befriend Dinner at the gym, strike up a conversation with Dinner at the coffeehouse, or introduce himself to Dinner in any number of other, less private and constitutionally unprotected settings.  Instead, Carscallen chose to prey upon Dinner at the height of his emotional distress and while he was most susceptible to undue influence – as he was acknowledging his sexual addiction in an attempt to stay sexually sober and repair his life.

26.      Carscallen's targeting of Dinner inside the 12-Step program was a calculated act of deceit and manipulation.  And it was illegal.  Consent obtained by fraud is no consent at all, thus Carscallen was illegally eavesdropping on the 12-Steppers' confidential communications.  C.R.S. § 18-9-304.  Carscallen knew that a program of recovering sex addicts, during which they reveal their innermost secrets, provided the perfect opportunity to gain the confidence and trust of a devoted, regularly attending member like Dinner.  Carscallen

understood the great benefit to him involved in developing such an intimate relationship with Dinner in that environment. Indeed, in group therapy, the belief that others are fellow members of the group "makes possible frank and intimate conversation which would have been totally out of place when they were merely strangers."[4]

27.   To achieve his objective of forging an intimate relationship with Dinner, Carscallen pretended to be a member of a "fellowship of men and women who share their experience, strength, and hope with each other that they may solve their common problem and help others to recover."[5] Of course, Carscallen sought not to aid in the recovery of others but rather to fraudulently obtain another's confidence and trust. As a result of Carscallen's deceitful infiltration of the program, Dinner mistakenly believed Carscallen to be a member of the fellowship and consequently conversed frankly and intimately with Carscallen, both within and without the 12-step setting.

28.   Thus, but for Carscallen's surreptitious invasion of the SA Twelve-Step program under false pretenses, Carscallen would not have gained Dinner's confidence and trust and their relationship would not have developed to the extent that it did. Therefore, any statements made or actions taken by Dinner subsequent to, as a function of, or borne out of Carscallen's fraudulently induced relationship with Dinner are fruits of Carscallen's unlawful conduct and constitutionally may not be used against Dinner. Likewise, any evidence derived from physical evidence, e.g. the 12-Step member roster and phone list, to include Dan Dinner's telephone number, unconstitutionally obtained by virtue of the Fourth Amendment violations of Agent Carscallen and his CBI confederates must be suppressed.

### FOURTH AMENDMENT CLAIMS
### AND FIRST AMENDMENT VIOLATIONS

29.   The Fourth Amendment of the United States Constitution establishes procedures or *process* that the government constitutionally must follow when it gathers information. *See, e.g., Katz* (establishing the reasonable expectation of privacy test). Though "protecting people, not places," *id. at* 350, the Fourth Amendment  often is vindicated by means of a focus on where evidence or documents are located, rather than what the evidence or documents

---

[4] James Rachels, *Why Privacy Is Important, in* PHILOSOPHICAL DIMENSIONS OF PRIVACY: AN ANTHOLOGY 290, 295 (Ferdinand David Schoeman ed. 1984).

[5] www.sa.org

reveal. *See California v. Greenwood*, 486 U.S. 35, 39—40 (1988) (upholding search and seizure of documents in garbage left out of for collection); *Robbins v. California*, 353 U.S. 420, 425–26 (1981) (holding searches of containers usually afforded Fourth Amendment protections were searchable without a warrant if the containers were in an automobile).  By contrast, the First Amendment is applied primarily by examining the *substantive* validity of laws, regulations, or government activities as applied to the content of the ostensibly protected activity.  *See Whitney v. California*, 274 U.S. 357, 373 (Brandeis, J. concurring) (stating the exercise of free speech and assembly are subject to restriction only if such restriction is essential to prevent some "substantive evil").

30.    The Supreme Court has recognized the unique relationship between the First and Fourth Amendments in searches and seizures of expressive material, holding that, when First Amendment activities are implicated by a search or a seizure, Fourth amendment procedures must be followed with "scrupulous exactitude." *Stanford v. Texas*, 379 U.S. 476, 485 (1965) ("[T]he constitutional requirement that warrants must particularly describe the "things to be seized" is to be accorded the most scrupulous exactitude when the "things" are books and the basis for their seizure is the ideas which they contain. No less a standard could be faithful to First Amendment freedoms.").

31.    When a search or seizure is conducted in the context of First Amendment expression, the procedure employed must be examined in light of the values of the freedom of expression. *See Roaden v. Kentucky*, 413 U.S. 496, 504 (1973) ("The setting of the bookstore or the commercial theater, each presumptively under the protection of the First Amendment, invokes such Fourth Amendment warrant requirements because we examine what is 'unreasonable' in the light of the values of freedom of expression."). *See also Tattered Cover, Inc. v. City of Thornton,* 44 P.3d 1044 (Colo. 2002).  When the nature of the materials seized or the setting from which they are taken falls within First Amendment protection, and the search or seizure halts that expression, the evaluation of reasonableness of the search or seizure must be more stringent. *See id.*  In *Tattered Cover*, the Colorado Supreme Court expressly held that Article 2, Section 10 of the Colorado Constitution provides greater protections to expression rights than the First Amendment.  The Court articulated a balancing test that government investigative methods must meet when protected expression rights are involved.  In order to survive the strict scrutiny applicable to the abridgment of fundamental speech rights, *id.* at 1057, the government must demonstrate that it has a compelling need for the information sought, and that need must outweigh the constitutional harms created by the investigative method. *Id.*, at 1060.

10

32.     In *Roaden*, a county sheriff purchased tickets to a drive-in theater and viewed a film. Id. at 498. The sheriff concluded the film was obscene and therefore its exhibition was in violation of a Kentucky state statue. *Id*. At the conclusion of the film the sheriff, without a warrant, arrested the manager of the theater and seized a copy of the film. *Id*. at 498–99. The Supreme Court held that the seizure by the sheriff was unreasonable under the Fourth and Fourteenth Amendment standards because the restraint involved expression protected by the First Amendment. *Id*. at 504. Of signal importance in this case is the concept of anonymity. Entirely central to the core purpose of SA, the very presence of Agent Carscallen in the meetings violated Mr. Dinner's and all other members' First Amendment and Colorado Constitutional rights. As the *Tattered Cover* court explicitly recognized:

> "Anonymity is often essential to the successful and uninhibited exercise of First Amendment rights, precisely because of the chilling effects that can result from disclosure of identity. The Supreme Court has recognized this principle numerous times in various contexts."

*Tattered Cover*, at 1052 (footnote omitted).

33.     The police procedures in this case did not meet the standard required by the First Amendment when infringing on expressive rights of the defendant at the 12-step program. In *Roaden*, the seizure was unreasonable "not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness." *Roaden*, at 504. Similarly, the searches and seizures worked in this case by means of the warrantless and surreptitious infiltration of a government agent into a setting and conversations subject to the First Amendment's protection of both expressive association and free exercise of religion was unreasonable not only because there were alternative methods that could have been used, but also because the restraint of the right of expressive assembly calls for a "higher hurdle in the evaluation of reasonableness" by the Court.   There was no relationship between the rights violated and the object of the investigation; indeed there was no reasonable suspicion that anything illegal was going on in connection with the 12-Step program at all. If unable to hurdle the federal constitutional test, then the police investigative conduct in this case of necessity fails to meet the more stringent, more protective balancing test articulated in *Tattered Cover* under the Colorado Constitution.

## DUE PROCESS VIOLATIONS UNDER THE
## FIFTH AND FOURTEENTH AMENDMENTS

34.    In surreptitiously infiltrating a protected setting in order to illegally eavesdrop on private and confidential conversations, the government engaged in conduct that was so outrageous that it violated Mr. Dinner's rights to due process under the Fifth and Fourteenth Amendments of the U.S. Constitution and under the Colorado Constitution.

35.    The doctrine of dismissal based upon the government's outrageous conduct is founded on the principle that fundamental fairness is offended when the conduct of law enforcement officers is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *U.S. v. Russell*, 411 U.S. 423, 431–32 (1973); *see also State v. Myers*, 689 P.2d 38 (1984); *State v. Smith*, 610 P.2d 869, *cert. denied*, 449 U.S. 873 (1980). For police conduct to violate due process, the conduct must shock the universal sense of fairness. *Russell*, at 432.

36.    Whether the government has engaged in outrageous conduct is a matter of law, not a question for the jury. *U.S. v. Dudden*, 65 F.3d 1461, 1466–67 (9th Cir.1995). *See also State v. Hohensee*, 650 S.W.2d 268, 272 (Mo.App.1982) (citing federal cases).

37.    Following *Russell*, nearly every federal circuit court and many state courts have recognized that the government's conduct may be so inappropriate as to violate due process. *See U.S. v. Harris*, 997 F.2d 812, 815 (10th Cir.1993); *Commonwealth v. Nelson*, 446 Pa.Super. 240, 666 A.2d 714, 719 (1995); *State v. Shannon*, 892 S.W.2d 761, 765 (Mo.App.1995).

38.    Courts are split on whether a separate constitutional violation must have been committed by the government to make out a cognizable due process claim. *Compare, e.g., Myers*, 689 P.2d 38 (separate constitutional violation required) *with U.S. v. Smith*, 924 F.2d 889, 897 (9th Cir.1991)( recognizing right of defendant to claim a due process violation based on outrageous government conduct without requiring a separate constitutional violation).

39.    Here, the government's conduct did violate specific constitutional rights of the Defendant – under the First and Fourth Amendments to the U.S. Constitution, and parallel provisions of the Colorado Constitution. Even courts opposed generally to the doctrine of outrageous governmental conduct have recognized the propriety of proscribing police conduct that violates the rights of a

defendant: "Where police conduct violates explicit rights, such as the Fourth Amendment protection against unwarranted searches and seizures, it is highly appropriate for the judiciary to proscribe the behavior." *State v. Rundquist,* 905 P.2d 922 (1995).

40.   Although, such claims largely have occurred in the context of entrapment – essentially "constitutional entrapment" cases, the doctrine is broader than that context.  For example, ssummarizing holdings from the federal courts, the court in *Myers* observed:  "It appears that the broad "fundamental fairness" guaranty is not transgressed absent "coercion, violence or brutality to the person". See *Irvine v. California,* 347 U.S. 128, 132, 133, 98 L.Ed. 561[,] 74 S.Ct. 381 [382–83, 383–84] (1954) (distinguishing *Rochin v. California,* 342 U.S. 165, 96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396 (1952)). *See also U.S. v. Kelly,* 707 F.2d 1460 (D.C.Cir.1983), and cases cited therein.  But the doctrine has been recognized to be broader than the entrapment or physical brutality context:  *See U.S. v. Bogart,* 783 F.2d 1428, 1435 (9th Cir.1986), *vacated on other grounds with respect to one defendant sub nom. U.S. v. Wingender,* 790 F.2d 802 (9th Cir.1986).

41.   In reviewing a claim by a criminal defendant that Due Process has been violated by a particular state procedure, the Court is to determine whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson v. New York,* 432 U.S. 197 (1977).  The court should evaluate the conduct based on the "totality of the circumstances." *U.S. v. Tobias,* 662 F.2d 381, 387 (1981), *cert. denied,* 457 U.S. 1108 (1982); *State v. Hohensee,* 650 S.W.2d 268 (Mo.App.1982).

42.   Outside of the entrapment context, and specifically in this case, Mr. Dinner submits that the Court should consider the following circumstances:

   a. The governmental justification *vel non* for targeting for invasion the constitutionally protected setting of a recognized 12-Step treatment program, *see  U.S  v. Smith,* 924 F.2d 889 (9th Cir.1991).

   b. Whether the government conduct amounted to criminal activity or other "improper conduct repugnant to a sense of justice." *Isaacson,* 406 N.Y.S.2d at 719, 378 N.E.2d at 83.

   c. The relationship between the government conduct and the criminal offenses for which the defendant is to be prosecuted. The "more immediate the impact of the government's conduct upon the particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety." *See U.S. v. Spivey,*

13

508 F.2d 146, 150 (10th Cir.), *cert. denied,* 421 U.S. 949 (1975).

    d. Whether the police motive was to prevent further crime or protect the populace. Here the government conduct demonstrates a greater interest in creating crimes to prosecute than in protecting the public from further criminal behavior. *See Bogart,* 783 F.2d at 1438; *U.S. v. Lard,* 734 F.2d 1290 (8th Cir.1984).

43.    Here, the government had at its disposal a large number of investigative tools that it simply declined to use in favor of its surreptitious invasion of the 12-Step program.   The government activity itself constituted a crime under Colorado state eavesdropping statutes.  C.R.S. § 18-9-304.  The conduct was, absent application of the COCCA statute, serial misdemeanor conduct.  It also violated Defendant's constitutional rights under the First and Fourth Amendments to the U.S. Constitution and Colorado Constitution counterpart protections.

44.    In this case, the government's conduct was so outrageous that it shocks the universal sense of justice.  12-Step programs have become a nationally recognized treatment alternative for millions of people attempting to recover from addictions of varying kinds.  Physicians, mental health professionals, and social workers refer their patients and clients to such programs as sources of additional treatment and continuing care. Courts in most, if not all, jurisdictions rely on such programs to augment the rehabilitative resources available to the criminal justice system.  These programs simply cannot function if the government may, without judicial supervision, without demonstrated need or cause, invade them in pursuit of their quarry in criminal investigations.  Such a practice, if sanctioned by the courts generally, or by this honorable Court in this case, would not only destroy the confidential, private and anonymous environment essential to such organizations' operation, preventing those needing this vital function from availing themselves of it, but would chill the exercise of their constitutional rights free religious exercise and expressive association by their members.

45.    The government conduct here is so egregious that a defendant may not be prosecuted based on "the ground of deprivation of due process." *Hohensee,* 650 S.W.2d at 271 (quoting *U.S. v. Bagnariol,* 665 F.2d 877 (9th Cir.1981)).  No other remedy will suffice.

46.    While the exclusionary rule exists to deprive the government of illegally-gotten gains in violation of the Fourth Amendment, it is not clear that such a remedy is available for the pure First Amendment violations inherent here, as a result of the government's conduct.  Without an exclusionary remedy, the appropriate remedy is dismissal — because otherwise the violations of Mr. Dinner's and others' First Amendment rights will go unremedied, and because for the Court to permit the government to prosecute a case or obtain a conviction in a manner so

46.     While the exclusionary rule exists to deprive the government of illegally-gotten gains in violation of the Fourth Amendment, it is not clear that such a remedy is available for the pure First Amendment violations inherent here, as a result of the government's conduct. Without an exclusionary remedy, the appropriate remedy is dismissal – because otherwise the violations of Mr. Dinner's and others' First Amendment rights will go unremedied, and because for the Court to permit the government to prosecute a case or obtain a conviction in a manner so blatantly in violation of constitutional rights would be unconscionable and would itself work a violation of Mr. Dinner's right to substantive due process under the Fifth and Fourteenth Amendments to the United States Constitution.

### PRAYER FOR RELIEF

WHEREFORE, the Mr. Dinner respectfully requests that the Court, after hearing and premises considered, order the government's evidence suppressed and the Indictment dismissed with prejudice.

Respectfully submitted this 17th day of January, 2012.

Law Firm of Leonard M. Chesler, P.C.

Leonard M. Chesler
Attorney for Daniel Dinner

Ridley, McGreevy & Winocur, P.C.

William L. Taylor
Attorney for Daniel Dinner

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of January, 2012, I served a true and correct copy of the foregoing **MOTION TO DISMISS AND/OR FOR SUCH LESSER BUT APPROPRIATE RELIEF AS SUPPRESSION OF STATEMENTS AND EVIDENCE** via U.S. Mail, addressed to the following:

Office of the Jefferson County District Attorney
Attention:  Mark Pautler, Esq. and Ben Sollarz, Esq.
500 Jefferson County Parkway
Golden, CO 80401-6002
Phone:  303-271-6800
Fax:  303-271-6888

Suzy M. Kamps

17